**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS DIVISION**

**DESIREE A. WILLIAMS,**

   **Plaintiff,**

**v.**             **Civil Action No. 2:12-cv-16**
                 **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT IN PART AND DENY IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11], GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14], AND REMAND THE DECISION OF THE ADMINISTRATIVE LAW JUDGE WITH INSTRUCTIONS**

## I. INTRODUCTION

On March 6, 2012, Plaintiff Desiree A. Williams ("Plaintiff"), by counsel Jonathan C. Bowman, Esquire, filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.) On May 1, 2012, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 7; Administrative Record, ECF No. 8.) On May 30, 2012, and July 30, 2012, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14.) Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.    BACKGROUND

### A.    Procedural History

On November 17, 2008[1], Plaintiff protectively filed a Title XVI claim for supplemental security income ("SSI"), alleging disability that began on February 10, 2006.[2]  (R. at 86-87, 195-201.)  Her claim was initially denied on March 16, 2009 and again upon reconsideration on July 24, 2009.  (R. at 94-101.)  On September 21, 2009, Plaintiff filed a request for a hearing (R. at 102), which was held before United States Administrative Law Judge ("ALJ") Jerry Meade on May 2, 2011.  (R. at 159-63.)  Plaintiff, represented by Jonathan Bowman, Esquire,  appeared and testified by video in Wheeling, West Virginia, while the ALJ presided from Huntington, West Virginia.  (R. at 12, 37-38.)   Gina Baldwin, an impartial vocational expert, also appeared and testified in Huntington.  (R. at 35-36, 38.)  On July 8, 2011, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act ("Act").  (R. at 12-28.)  On January 11, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.)  Plaintiff now requests judicial review of the ALJ's decision finding her not disabled.

### B.    Personal History

Plaintiff was born on January 29, 1958 and was 50 years old when she filed her application

---

[1]  The ALJ's decision lists a date of November 17, 2008 for when Plaintiff filed her application for SSI. (R. at 12.)  Her application, contained as Exhibit C1D in the Administrative Record, refers to a date of December 9, 2008.  (R. at 195.)  However, the Disability Determination and Transmittal sheets included in the Administrative Record as Exhibits C2A and C3A list a filing date of November 17, 2008.  (R. at 86-87.)

[2] Plaintiff, through counsel, moved the ALJ to amend her alleged onset date to September 27, 2008.  (R. at 275.)

for SSI.  (R. at 195.)  She earned her GED and has past work experience as a cashier, bakery worker, and motel housekeeper.  (R. at 211, 218.)  Plaintiff has been married three times before, but all three marriages ended in divorce.  (R. at 195-96.)  Plaintiff is not married and does not have any dependent children.  (R. at 196, 202.)

## C.    *Relevant Medical History*

### 1.    Relevant Medical History Pre-Dating Amended Alleged Onset Date of September 27, 2008

Plaintiff presented at the Ohio Valley Medical Center with numbness in her right foot on September 24, 2004.  (R. at 280.)  Dr. Wladimir Zyznewsky found "[a]bnormal nerve conduction velocities suggestive of neuropathy effecting both right and left lateral plantars in a patient with a history of diabetes mellitus."  (*Id.*)  However, he found no signs of radiculopathy.  (*Id.*)  On November 4, 2004, Plaintiff had an appointment for an ingrown toenail at the Goodwin Foot and Ankle Center.  (R. at 281.)  Her doctor at this appointment noted that she suffered from non-insulin dependent diabetes mellitus.  (*Id.*)

On August 31, 2005, Dr. Paul Young, a licensed psychologist, performed a consultative mental examination of Plaintiff.  (R. at 282-87.)  At this appointment, Plaintiff reported experiencing auditory hallucinations.  (R. at 283.)  She also noted that she frequently felt anxious, irritable, and depressed.  (*Id.*)  During the examination, Dr. Young noted that Plaintiff had fair levels of alertness, cooperation, and motivation.  (R. at 285.)  She also appeared depressed with a sad demeanor and a flat affect.  (*Id.*)  He diagnosed her with schizophrenia, paranoid type; and bipolar disorder, most recent episode depressed, and noted a fair prognosis.  (R. at 286.)

Plaintiff continued to receive diabetic foot care at the Goodwin Foot and Ankle Center during 2005.  (R. at 289-93.)  At all five appointments, it was noted that Plaintiff had painful

ambulation.  (*Id.*)  During these appointments, Plaintiff's nails were debrided and proper foot care was discussed.  (*Id.*)  She was also provided with various prescriptions at these appointments.  (R. at 289, 291-93.)

The record contains treatment notes from Goodwin Foot and Ankle Center for 2006.  (R. at 295-302.)  On July 14, 2006, Plaintiff presented with pain in her left hallux.  (R. at 302.)  An examination revealed pain on palpation and with range of motion; Dr. Goodwin also noted that Plaintiff had painful ambulation on her left leg.  (*Id.*)  Plaintiff's condition remained unchanged on August 15, 2006.  (R. at 301.)  She had three follow-up appointments throughout 2006 for her left hallux sprain and tendinitis.  On September 14, 2006 and October 23, 2006, Dr. Goodwin noted that Plaintiff still had some pain in her left hallux and painful ambulation.  (R. at 297-300.)  On November 16, 2006, Dr. Goodwin noted that Plaintiff had painful ambulation and that her toenails were discolored, thickened, and painful.  (R. at 295.)  He debrided her toenails and instructed her on proper diabetic foot care.  (R. at 296.)

On November 20, 2006, Plaintiff saw Dr. Mark Rodosky at the University of Pittsburgh for left shoulder and neck pain.  (R. at 310-12.)  At this appointment, Plaintiff complained that her pain had persisted and that no treatment had provided any lasting relief.  (R. at 311.)  Dr. Rodosky assessed impingement of the left shoulder and noted that an MRI showed "inflammatory changes in the rotator cuff."  (*Id.*)  He recommended that Plaintiff undergo arthroscopy of the left shoulder, and Plaintiff agreed to the procedure.  (R. at 312.)

Dr. Daniel Rockey performed an MRI of Plaintiff's cervical spine on May 16, 2007.  (R. at 456.)  He noted "small posterior central disc herniations at C4/C5 and C5/C6 without interval change."  (*Id.*)  He also noted that there had been no change in Plaintiff's MRI since the one

performed in May 2006. (*Id.*) On June 6, 2007, Plaintiff had an MRI of her left upper extremity done at Ohio Valley Medical Center. (R. at 703.) Dr. Joseph Capito noted that Plaintiff had a "full thickness supraspinatus tendon tear near its attachment with no tendon retraction" and "edema within the anterior rotator cuff interval as well as a a small amount of fluid in the subacromial-subdeltoid space." (*Id.*)

Plaintiff again saw Dr. Rodosky on July 23, 2007 because of left shoulder pain after another car accident in March 2007. (R. at 309.) He noted that Plaintiff had a full-thickness rotator cuff tear and recommended that she undergo arthroscopy of the left shoulder. (*Id.*) Dr. Rodosky performed this surgery on Plaintiff on August 30, 2007. (R. at 305-06.) He noted that Plaintiff was in a stable condition after the surgery. (R. at 306.) After the surgery, Dr. Rodosky diagnosed left shoulder chronic full-thickness rotator cuff tear; left shoulder subacromial impingement; and left shoulder frozen shoulder and superior labral fraying. (R. at 305.) Six months later, an MRI of Plaintiff's left shoulder showed a significant decrease in the size of joint space and edema within the rotator cuff interval, suggestive of adhesive capsulitis; a small partial tear involving the articular surface of the supraspinatus; an intact bursal surface of the rotator cuff; and an intact labrum. (R. at 303.)

Dr. Rodosky saw Plaintiff twice after her rotator cuff surgery. On September 7, 2007, Plaintiff reported that she was doing well after her surgery. (R. at 308.) Dr. Rodosky told her to begin a passive range of motion and to see a physical therapist to work on getting full range of motion. (*Id.*) On November 12, 2007, Plaintiff reported that she had slipped and fell and used her left arm to catch herself. (R. at 307.) Because of this, she had been experiencing increased pain in her left shoulder, but also admitted that her pain had begun to decrease. (*Rid.*) Dr. Rodosky indicated that she should continue with physical therapy and noted that it appeared that Plaintiff had

not injured anything severely.  (*Id.*)

Plaintiff had one appointment at Northwood Health Systems on December 11, 2007.  (R. at 335-37.)  At this appointment, Plaintiff complained of problems sleeping, irritability, anxiety, and a poor mood.  (R. at 335.)  Monica Smith, Nurse Practitioner, noted that Plaintiff was alert and oriented but had a "down" mood.  (*Id.*)  Counselor Shirley Juare also noted that Plaintiff was depressed over her health and her loss of independence.  (R. at 337.)

Plaintiff continued to receive treatment at Goodwin Foot and Ankle Center throughout 2007.  (R. at 313-34.)  On February 2, 2007, she underwent a partial permanent nail avulsion of the medial margin of the left hallux because her left big toenail was ingrown.  (R. at 332-33.)  During these visits, Dr. Goodwin noted that Plaintiff had painful ambulation and that her "range of motion is decreased bilateral lower extremity."  (R. at 313, 315, 317, 319, 321, 323, 325, 327, 330.)  He also noted that Plaintiff's toenails were thickened, discolored, and deformed.  (R. at 313-34.)

During the first four months of 2008, Plaintiff complained of left shoulder pain to her primary care physician, Dr. Marilyn Horacek.  (*See* R. at 481-88.)  On January 4, 2008, Plaintiff complained of having spasms in her shoulders and arms.  (R. at 487.)  On March 10, 2008, Plaintiff complained that she was still experiencing shoulder pain that was a six on a ten-point scale.  (R. at 483.)  She rated her pain at a seven on April 7, 2008.  (R. at 482.)  On April 29, 2008, Plaintiff still complained of left shoulder pain, but Dr. Horacek noted that she had no follow-up appointment scheduled with her surgeon, Dr. Rodosky.  (R. at 481.)

Plaintiff continued to see Dr. Rodosky for her shoulder pain throughout 2008.  (R. at 338-42.)  On January 14, 2008, Plaintiff noted that she was doing well in terms of pain, but still felt stiff.  (R. at 342.)  Two months later, Dr. Rodosky noted that Plaintiff was still stiff and still displaying

the same range of motion as two months ago.  (R. at 341.)  He ordered an MRI of her rotator cuff.

(*Id.*)  That MRI revealed that Plaintiff had "significant decrease in size of joint space and edema

within the rotator cuff interval" and that these were "findings suggestive of adhesive capsulitis."

(R. at 701.)  The MRI also revealed a "small partial tear involving the articular surface of the

supraspinatus."  (*Id.*)  On June 16, 2008, Dr. Rodosky noted that Plaintiff's MRI showed a recurrent

rotator cuff tear and that she would need arthroscopic rotator cuff repair, capsular release,

manipulation, and possible repair of other tissue.  (R. at 340.)

Dr. Horacek completed a questionnaire regarding Plaintiff's impairments on July 7, 2008.

(R. at 276-79.)  She noted that Plaintiff's symptoms included pain in her left shoulder, neck, back,

and both hands.  (R. at 276.)  Dr. Horacek also stated that Plaintiff's depression, anxiety, and

personality disorder affected her physical condition.  (*Id.*)  According to her, Plaintiff's pain was

severe enough to constantly interfere with her attention and concentration, and that she was

incapable of even "low stress" jobs.  (R. at 277.)  According to Dr. Horacek, Plaintiff could

continuously sit for thirty minutes and stand for fifteen minutes, and could stand and walk less than

two hours in an eight-hour day and sit for about two hours in an eight-hour day.  (*Id.*)  She also noted

that Plaintiff needed to walk every five minutes for two minutes each time.  (*Id.*)  Dr. Horacek

determined that Plaintiff needed to be able to take unscheduled breaks for thirty minutes every hour

during an eight-hour working day.  (R. at 278.)  At that time, she noted that Plaintiff could

occasionally lift and carry less than ten pounds.  (*Id.*)  Plaintiff would also miss work more than four

times per month, and would be bothered by environmental hazards.  (*Id.*)

On September 10, 2008, Plaintiff presented to the emergency room of the Ohio Valley

Medical Center with left-sided back and chest pain.  (R. at 473-74.)  Doctors at the emergency room

noted that Plaintiff had "some tissue texture changes of the left T7 paravertebral area of bogginess," but that she had no other tenderness in her thoracic or lumbar spine. (R. at 473.) She was discharged with a prescription for Carafate and instructions to follow-up with her primary care provider in three to five days. (R. at 474.)

Plaintiff continued to receive pharmacological management at Northwood Health Systems throughout 2008. (R. at 347-50, 354-55, 357-58, 361-62.) On January 16, 2008, Plaintiff reported feeling depressed, but CFNP Monica Smith noted that Plaintiff had not been compliant with her medication. (R. at 347.) Plaintiff reported no difficulties and described an improvement in her mood, irritability, and agitation at her next two appointments. (R. at 348-49.) However, on March 26, 2008, she reported feeling depressed because of her health, including her shoulder, and her inability to work. (R. at 350.) CFNP Smith continued her current medications and increased her Restoril/temazepam prescription. (*Id.*) At Plaintiff's next two appointments, she denied any difficulties, and CFNP Smith noted that she had a normal mood and affect. (R. at 354-55.) However, on June 18, 2008, Plaintiff reported feeling depressed and anxious over her upcoming shoulder surgery. (R. at 357.) CFNP Smith noted that she had a tearful affect, continued her medications, increased her Zoloft prescription, and added Vistaril and Buspar. (*Id.*) Plaintiff reported feeling less moody at her next appointment. (R. at 358.) On August 6, 2008, she stated that she was feeling depressed and anxious from looking for a new apartment and from still needing shoulder surgery. (R. at 361.) CFNP Smith noted that Plaintiff had a blunted affect, continued her current medications, and added a Deplin prescription. (*Id.*) On September 3, 2008, Plaintiff reported no difficulties; however, she reported feeling depressed again on October 1, 2008. (R. at 362-63.)

During this time, Plaintiff also received individual therapy at Northwood. On April 8, 2008, Plaintiff reported depression that made her only want to eat, lie down, or sleep. (R. at 351.) Two weeks later, Plaintiff stated that she had been feeling frustrated and angry because of her financial situation and because of pain in her shoulder. (R. at 353.) During her appointments in July, Plaintiff again reported feeling depressed and stressed because of her shoulder pain and her limitations in daily functioning. (R. at 359-60.)

Plaintiff continued to receive diabetic foot care at Goodwin Foot and Ankle Center throughout 2008. (R. at 440-55.) During these visits, Dr. Goodwin noted that Plaintiff had painful ambulation, deformed toenails, and that her "range of motion is decreased bilateral lower extremity." (R. at 440, 442, 444, 446, 450, 452, 454.) On September 5, 2008, Plaintiff again underwent a partial permanent nail avulsion of the medial margin of the left hallux because of a painful, deformed ingrown nail on her left big toe. (R. at 448-49.) Dr. Goodwin noted that Plaintiff tolerated the procedure well and "left the operating room with vascular status intact to the left foot." (R. at 448.)

### 2. Relevant Medical History Post-Dating Amended Alleged Onset Date of September 27, 2008

The administrative record notes that Plaintiff received physical therapy at Mason Rehab from October through December 2008. (R. at 524-54.) On October 27, 2008, physical therapist Jill Prezzia noted that Plaintiff tolerated passive range of motion in flexion and abduction "fair." (R. at 554.) A day later, Plaintiff complained of a lot of soreness following her first day of treatment. (R. at 553.) On October 30, 2008, Plaintiff stated that she was "doing alright." (R. at 551.) However, during the early part of November 2008, Plaintiff complained of discomfort, and Ms. Prezzia noted that Plaintiff's external rotation was the most limited. (R. at 543, 547-49.) On November 28, 2008, Ms. Prezzia noted that Plaintiff's arm was doing "fairly well" (R. at 536);

however, on December 10, 2008, Plaintiff complained that her shoulder was bothering her (R. at 531). On December 26, 2008, Plaintiff's second to last appointment, Plaintiff noted that she was doing all right even though she still experienced some discomfort in her shoulder. (R. at 525.) Ms. Prezzia noted that Plaintiff's range of motion had improved. (*Id.*) The progress notes also reflect that Plaintiff cancelled or did not appear for six appointments. (R. at 526, 530, 533, 534, 539, 545.)

On October 14, 2008, Dr. Rodosky performed arthroscopic rotator cuff repair surgery on Plaintiff. (R. at 698.) During the surgery, he also performed subacromial decompression with acromioplasty, arthroscopic capsular release including manipulation, and debridement of the superior labrum. (*Id.*) His diagnosis before surgery was of recurrent chronic full-thickness rotator cuff tear, left shoulder; recurrent subacromial impingement, left shoulder; recurrent frozen shoulder left shoulder; and left shoulder Type I slap lesion. (*Id.*) Dr. Rodosky noted that Plaintiff was taken to the recovery area after surgery in a stable condition. (R. at 699.)

Plaintiff had a follow-up appointment with Dr. Rodosky on November 22, 2008 after arthroscopic rotator cuff repair. (R. at 338-39.) At this appointment, Dr. Rodosky noted that the repair was "stable enough to allow her to do active range of motion and come out of the sling." (R. at 339.) He ordered Plaintiff to complete aggressive physical therapy five times per week and warned her that she was still at significant risk for frozen shoulder. (R. at 338.)

Plaintiff had three appointments at Northwood Heath Systems during October and November 2008. (R. at 363-65.) On October 1, 2008, Plaintiff reported feeling depressed. (R. at 363.) Dr. Steve Corder noted that Plaintiff had a stable and appropriate but restricted affect. (*Id.*) He also noted that she had slowed speech and motor activity. (*Id.*) On November 30, 2008, Plaintiff reported no difficulties, but she complained of having some difficulties falling and staying asleep.

(R. at 364.) She reported that her mood was better and more mellow since her medication change. (*Id.*) However, on November 26, 2008, Plaintiff felt depressed and reported feeling increased stress, irritability, and anxiousness. (R. at 365.) Dr. Corder continued her medications and increased her Cymbalta prescription. (*Id.*)

On February 4, 2009, Cindy Osborne, DO, completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 562-69.) She noted that Plaintiff could occasionally lift and carry up to twenty pounds; could frequently lift and carry up to ten pounds; could stand, walk, and sit for about six hours during an eight-hour workday, but must periodically alternate standing and sitting for discomfort; and was unlimited in pushing and pulling. (R. at 563.) Plaintiff could never climb ladders, ropes, and scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (R. at 564.) She was limited in reaching in all directions, including overhead. (R. at 565.) Ms. Osborne determined that Plaintiff should avoid all exposure to hazards and avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. (R. at 566.) Ms. Osborne found that Plaintiff was mostly credible and that she could perform light work with limitations. (R. at 567.) She noted no changes in Plaintiff's residual functional capacity ("RFC") on February 23, 2009 after reviewing the new medical evidence. (R. at 574.) Dr. Fulvio Franyutti also agreed with Ms. Osborne's assessment on July 20, 2009 after reviewing all medical evidence in Plaintiff's file. (R. at 689.)

Holly Coville, a licensed psychologist, completed a consultative examination of Plaintiff on February 10, 2009. (R. at 575-80.) At this appointment, Plaintiff complained of increased crying, poor sleep, depression, increased irritability, periods of confusion, and feelings of helplessness, worthlessness, and hopelessness. (R. at 576.) During the examination, Ms. Coville noted that

Plaintiff was cooperative, oriented, but displayed a depressed mood and flat affect. (R. at 578.) She also determined that Plaintiff's pace and persistence were within normal limits, but that she had impaired judgment and insight. (*Id.*) Ms. Coville diagnosed Plaintiff with major depressive disorder, recurrent, moderate, and noted that she had a fair prognosis. (*Id.*)

Dr. Joseph Shaver completed a Psychiatric Review Technique of Plaintiff on March 16, 2009. (R. at 581-94.) He noted that Plaintiff suffered from MDD that was recurrent and moderate, she did not have a severe impairment. (R. at 581, 584.) Dr. Shaver noted that Plaintiff was mildly limited in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, and pace. (R. at 591.) He also reported that Plaintiff's "reported problems with memory, concentration and social functioning appear to be inconsistent with results of her MSE." (R. at 593.) Dr. Frank Roman agreed with this assessment on July 23, 2009 after reviewing all evidence in Plaintiff's file. (R. at 690.)

On April 15, 2009, Plaintiff had a follow-up appointment with Dr. Rodosky regarding her rotator cuff repair. (R. at 696.) He noted that Plaintiff was still stiff and had "85 elevation, 30 of external rotation." (*Id.*) Dr. Rodosky determined that Plaintiff needed aggressive physical therapy and that she had "a little proximal migration of the humerus consistent with a frozen shoulder." (*Id.*) He noted that she may need a third surgery for further manipulation, but was hopeful that she could work it out with therapy. (*Id.*)

Plaintiff had a nerve conduction study of her lower extremities performed at Ohio Valley Medical Center on April 27, 2009. (R. at 611.) After this study, Dr. Wladimir Zyznewsky's impression was of "peripheral neuropathy bilateral symmetric in nature, moderate electrophysiologically lower extremities." (*Id.*)

On May 20, 2009, Plaintiff complained of right shoulder pain at an appointment with Dr. Horacek.  (R. at 604.)  She complained that the pain radiated down into her hand and that she was experiencing some numbness.  (*Id.*)  After an examination, Dr. Horacek noted that Plaintiff had full flexion and extension but a decreased range of motion.  (R. at 605.)  She ordered an MRI of her shoulder and that she undergo physical therapy at Mason Center.  (*Id.*)

Plaintiff had an MRI of her right shoulder done at Ohio Valley Medical Center on June 17, 2009.  (R. at 688.)  Dr. James Patrizi noted that she had some "degenerative changes at the acromioclavicular joint."  (*Id.*)  He also noted "some increased signal in the supraspinatus tendon probably due to tendinopathy or partial tendon tear."  (*Id.*)  The MRI also revealed that the 'rest of the muscles and tendons of the rotator cuff appear intact."  (*Id.*)  After the MRI, Dr. Rodosky recommended that Plaintiff undergo arthroscopic rotator cuff repair along with the possible repair of other tissue because of the recurrent rotator cuff tear.  (R. at 768.)  Plaintiff agreed to undergo this surgery.  (*Id.*)

On August 11, 2009, Plaintiff had an appointment with Dr. Horacek for left leg pain running from her foot to her hip.  (R. at 732.)  After an examination, Dr. Horacek noted that Plaintiff had intact sensation and no edema, but that she did have some tenderness to palpation in her left leg.  (R. at 733.)

Plaintiff continued to receive physical therapy at Mason Rehab from January through June 2009.  (R. at 621-87.)  On March 2, 2009, Plaintiff stated that she was feeling "fair" (R. at 663); however, at her next appointment on March 4, 2009, she "continue[d] to complain of discomfort" (R. at 662).  Physical therapist Jill Prezzia noted on March 13, 2009 that Plaintiff's range of motion was "doing fairly well" and that her strengthening was "doing fair."  (R. at 659.)  She noted on April

8, 2009 that Plaintiff's arm was doing fairly well. (R. at 648.) On June 9, 2009, Ms. Prezzia provided a treatment update and noted that Plaintiff had "shown some improvement." (R. at 623.) However, the record reflects that Plaintiff cancelled or did not show for fifteen appointments, and that she was late for five appointments. (R. at 628, 636, 641, 650, 651, 653, 654, 657, 658, 661, 665, 668, 677, 678, 679, 680, 683, 684, 685, 686.)

Plaintiff continued to receive pharmacological management at Northwood Health Systems throughout 2009. During January, February, and March, Plaintiff reported feeling less irritable and agitated and that her depression had improved. (R. at 779-81.) CFNP Smith particularly noted that Plaintiff had been maintaining control when irritable because she was less verbally aggressive. (R. at 781.) In April, CFNP Smith noted that Plaintiff was irritable and agitated because of conflicts with her neighbors, stressed and anxious because of her mother's illness, and depressed. (R. at 801.) In May and June, Plaintiff stated that she was depressed over her health issues, but she also admitted that her medications were working well. (R. at 804, 807.) In July, Plaintiff denied any problems with her medication, but she also reported feeling anxious, irritable, and depressed because of her brother's illness, her own health problems, and conflicts with her siblings. (R. at 810.) In September, Plaintiff stated that she had been grieving her mother's death and had been more irritable and depressed; however, she also reported that she had been going out and doing things occasionally. (R. at 811-12.) CFNP Smith discontinued Plaintiff's Temazepam, Vistaril, and Buspar, continued her Cymbalta and Deplin, and started an Ambien prescription. (R. at 811.) In October, Plaintiff reported increased grief and depression from her niece and great-nephew being burned and killed in a house fire. (R. at 815.) Finally, Plaintiff reported some irritability and depression in December, due in some part to the holiday season and her mother's death in August.

(R. at 825.)

On March 27, 2009, Drs. Leonard Wellman and Ronald Rielly of Northwood completed a psychological evaluation of Plaintiff. (R. at 782-92.) At this evaluation, Plaintiff complained of suffering from depression, anxiety, stress, and poor sleep. (R. at 783.) She noted that she was constantly worried about both her financial situation and unemployed status. (*Id.*) However, she reported that she was not currently seeking employment at that time. (R. at 784.) During the evaluation, Drs. Wellman and Rielly noted that Plaintiff had adequate attention and concentration and that her memory was intact. (R. at 785.) They also noted that her feelings of sadness, unhappiness, and depression affected her functioning because she does not get out of bed and sits around and cries. (R. at 786.) However, Plaintiff did indicate that she received "some benefits from psychotropic medications." (*Id.*) After administering the Beck Depression Inventory–II, Drs. Wellman and Rielly noted that Plaintiff's score of 41 indicated severe depression. (R. at 787.) Plaintiff also had elevated scores for depressive personality disorder, borderline personality disorder, schizotypal personality disorder, and paranoid personality disorder. (R. at 788.) In addition, she had elevated scores for dysthymia and anxiety disorder. (R. at 790.) Overall, Drs. Wellman and Rielly diagnosed major depression, recurrent, moderate; cocaine dependence, sustained full remission; and personality disorder. (R. at 791.) They assessed a current Global Assessment of Functioning ("GAF") score of 38 and recommended that Plaintiff continue receiving pharmacological management and consider re-engaging in individual therapy. (R. at 792.)

Plaintiff also participated in some individual therapy at Northwood during 2009. On April 24, 2009, psychologist Brenda Hart noted that Plaintiff had an angry mood and irritable affect. (R. at 802.) At this appointment, Plaintiff reported that she had been experiencing stress from having

no income and that she had been having regular conflict with a neighbor and her sister. (*Id.*) On May 26, 2009, Ms. Hart reported that Plaintiff again had an angry mood and irritable affect. (R. at 805.) Plaintiff stated that she had continued to experience increased agitation, hostility, anxiety, and depression because of health problems, financial stress, and conflicts with neighbors. (*Id.*) However, Ms. Hart noted that Plaintiff had made minimal progress because she had limited insight into her feelings, tended to be entitled, and exhibited little motivation to make therapeutic changes or work toward effective problem solving. (R. at 806.) On June 29, 2009, Ms. Hart reported that Plaintiff had a normal mood and affect, but Plaintiff stated that she had been experiencing increased anxiety and stress because of family issues, particularly her brother's diagnosis of colon cancer. (R. at 808.) Because of her increased anxiety and depression, Plaintiff had been experiencing increased hostility and agitation. (*Id.*) However, Ms. Hart noted that Plaintiff had fair progress because she demonstrated some insight into her moods and behaviors and acknowledged that she tends to react to stressful situations with hostility. (R. at 809.) Finally, on September 23, 2009, Ms. Hart reported that Plaintiff had a depressed mood and blunted affect because of her grief over her mother's death. (R. at 813.) Plaintiff also stated that she had been experiencing stress because of family issues. (*Id.*) Ms. Hart noted that Plaintiff was making good progress because she was able to "honestly explore her feelings related to the recent death of her mother and other situational stressors. (R. at 813-14.)

Plaintiff was treated twice by W.D. Grubbs, DC during January 2010. (R. at 770-71.) On January 8, 2010, Plaintiff had an appointment for Grubbs to evaluate her injuries after a car accident. (R. at 770.) She complained of neck, upper back, and right arm pain. (*Id.*) Grubbs noted that her range of motion was "restricted to horizontal elevation, otherwise full." (*Id.*) This examination also revealed increased sensation in her right upper extremity and bilaterally restricted shoulder motion.

(*Id.*) Grubbs' preliminary diagnosis was cervical strain/sprain, thoracic strain right shoulder strain, moyfascitis, and brachial neuralgia. (*Id.*) Plaintiff "was treated with deep moist heat with electric muscle stimulation, ultrasound and mechanical massage." (*Id.*) On January 13, 2010, Plaintiff complained that her pain returned after several hours had passed following her past treatment. (R. at 771.) Grubbs noted that Plaintiff had restricted cervical and shoulder motion. (*Id.*) She also had tender posterior cervical muscles and tender C4 to T7 spinouses. (*Id.*)

On July 6, 2010, Plaintiff had an appointment with Dr. Horacek for chronic back pain. (R. at 716.) She complained of joint pain in her shoulder that was exacerbated by other movement and activity, such as raising her right arm. (R. at 719.) Dr. Horacek's examination revealed that Plaintiff had a normal back but tenderness in her left shoulder. (R. at 721.) She assessed rotator cuff tear; tendonitis shoulder (frozen); and diabetes mellitus Type II. (R. at 722.)

Plaintiff continued to receive services at Northwood Health Systems throughout 2010. (R. at 826-38.) During the first four months of the year, Plaintiff reported feeling depressed, irritable, anxious, and unable to sleep. (R. at 826-31.) She also complained of feeling stressed out and overwhelmed. (R. at 826, 827, 829.) In May, June, and July, however, Plaintiff denied feelings of depression, irritability, and agitation, and she reported feeling calmer and less stressed. (R. at 832-34.) However, in early August, Plaintiff reported feeling irritable because of family problems and depressed because of the one-year anniversary of her mother's death. (R. at 835.) However, in September and October, although Plaintiff complained of some irritability, she also stated that she was sleeping well and was not having any problems. (R. at 837-38.)

On March 9, 2011, Dr. Damon Brooks completed a Mental Impairment Questionnaire (RFC & Listings) on Plaintiff. (R. at 759-63.) He noted that Plaintiff suffers from major depression,

diabetes, and a personality disorder. (R. at 759.) Dr. Brooks assigned a GAF score of 40 and stated that her highest GAF during the past year was 40. (*Id.*) He noted that Plaintiff suffers from poor memory, mood and sleep disturbances, recurrent panic attacks, feelings of guilt and worthlessness, isolation, decreased energy, hostility, and irritability. (*Id.*) Dr. Brooks opined that Plaintiff's impairments would cause her to be absent from work more than three times per month. (R. at 761.) He determined that Plaintiff's abilities to maintain attention for two-hour segments; work in coordination with or in proximity to others; complete a normal workday and workweek without interruptions; get along with co-workers; respond appropriately to work setting changes; and deal with normal work stress were poor. (R. at 761-62.) He also noted that her ability to deal with the stress of semiskilled and skilled work was poor. (R. at 762.) Overall, Dr. Brooks stated that Plaintiff was extremely limited in her activities of daily living and her ability to maintain social functioning. (R. at 763.) He also noted that Plaintiff often had deficiencies of concentration, persistence, or pace, and that she experienced continual episodes of deterioration or decompensation that cause her to withdraw from situations or experience exacerbation of signs and symptoms. (*Id.*)

Plaintiff continued to receive services at Northwood Health Systems during the early part of 2011. (R. at 839-47.) On January 17, 2011, Plaintiff reported feeling depressed at times; however, CFNP Smith noted that Plaintiff had a normal affect and was oriented. (R. at 839.) On February 14, 2011, staff at Northwood stated that Plaintiff suffers from moderate to severe depression and anxiety. (R. at 845.) On March 14, 2011, Plaintiff reported feeling depressed, anxious, and irritable because of family problems. (R. at 847.) CFNP Smith continued Plaintiff's current medications and added Buspar and Vistaril prescriptions. (*Id.*)

On April 19, 2011, Dr. Horacek completed a Functional Capacity Assessment of Plaintiff.

(R. at 764.)  She noted that Plaintiff could frequently lift and carry less than five pounds but could not lift and carry anything above that.  (*Id.*)  Dr. Horacek determined that Plaintiff could stand, walk, and sit for less than three hours.  (*Id.*)  She reported that Plaintiff was limited in pushing and pulling because of her shoulder problems and weakness in her arm.  (*Id.*)  Dr. Horacek noted that Plaintiff could occasionally climb, stoop, and bend, but could never kneel, crouch, and crawl.  (*Id.*)  According to her, Plaintiff was limited in reaching, handling, fingering, and feeling.  (*Id.*)  She determined that Plaintiff had environmental restrictions because she was bothered by dust and extreme temperatures.  (*Id.*)  Overall, Dr. Horacek determined that Plaintiff could not work because of her shoulder.  (*Id.*)

## D. *Testimonial Evidence*

At the hearing before the ALJ, Plaintiff testified that she received vocational training in small engine repair during her incarceration.  (R. at 40.)  She also received a certificate in nursing assistance.  (R. at 40-41.)  However, her certificate is no longer valid.  (R. at 55.)  Plaintiff testified that she last worked in 2006 as a cashier at a convenience store.  (R. at 41.)

Plaintiff stated that she was in two car accidents in 2006.  (R. at 41.)  After the car accidents, she could not work because the pain in her left shoulder precluded her from lifting.  (*Id.*)  Plaintiff testified that she had two arthroscopic surgeries to repair the rotator cuff in her left arm.  (R. at 42.)  She also noted that she was going to need surgery on her right arm and another surgery on her left arm because she still could not lift that arm.  (*Id.*)

At the hearing, Plaintiff testified that she has problems with her neck and shoulders because of inflammation and arthritis.  (R. at 43.)  She also stated that she has problems with her feet because she keeps falling down the steps and her legs keep hurting.  (*Id.*)  Plaintiff is diabetic and takes

insulin every day, but testified that her blood sugar is still out of control. (*Id.*) She also suffers from carpal tunnel, and had to have surgery for a trigger thumb related to her carpal tunnel. (R. at 45-46.)

Plaintiff testified that her psychological problems began to be an issue around 1986 or 1987. (R. at 44.) She received treatment for depression from Northwood Health Systems. (*Id.*) Plaintiff testified that she currently receives treatment for depression and takes medication for depression and bipolar disorder. (R. at 44-45.) She reported that those medications make her drowsy to the point where she sleeps a lot and cannot drive. (R. at 45.) Plaintiff sees a mental health professional for therapy and medication checks. (*Id.*)

Plaintiff's attorney also examined her at the hearing. Plaintiff testified that she was in a motor vehicle accident in 2010. (R. at 46.) She specified that she has bulging discs in her back and inflammation in her neck. (R. at 47.) Plaintiff noted that she was taking Miralax for bowel issues. (*Id.*) Plaintiff testified that she also suffers from bursitis, GERD, high cholesterol, high blood pressure, and glaucoma. (R. at 48.) However, she considered her biggest problem to be her shoulders. (*Id.*)

Plaintiff spends most of her time lying down and watching television, and she does not cook or go places like she used to. (R. at 49, 53.) She testified that her friends or brother will bring food to her or she will use the microwave to prepare food. (*Id.*) She also noted that her friends and family will come over to help her clean. (R. at 50.) Plaintiff can sit for half an hour to forty-five minutes and stand for forty-five minutes to an hour before becoming uncomfortable. (R. at 51.) She lies down "mostly every day" because of her pain. (R. at 52.) Plaintiff can lift small bags of rice and other little things at a store, but she has to take someone with her to lift heavy things. (*Id.*) She rated her average pain around an eight on a ten-point scale, and testified that her pain never goes

below an eight. (R. at 54.) However, she noted that every night her pain increases to a ten. (*Id.*)


**E.** *Vocational Evidence*

Also testifying at the hearing before the ALJ was Gina Baldwin, an impartial vocational expert. She classified Plaintiff's past work as a cashier and stock clerk as heavy work with a skilled vocational preparation ("SVP") of four; however, she indicated that this work was light as Plaintiff performed it. (R. at 59.) She also classified Plaintiff's past work as a bakery worker as medium work with an SVP of two and her employment as a hotel maid as light work with an SVP of two. (*Id.*)

The ALJ then posed the following hypotheticals to Ms. Baldwin:

Q:     Okay. Thank you, Ms. Baldwin. If you were to assume a hypothetical individual of the claimant's age, education, and work experience, who is able to perform light work, needs a sit/stand option at one hour intervals, could never climb ladders, ropes, or scaffolds, can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl. With the non-dominant left upper extremity the hypothetical individual can never reach, including overhead, or perform side lifting. With the right dominant upper extremity the hypothetical individual can frequently reach, including overhead, and perform side lifting. The hypothetical individual can frequently handle, finger, and feel bilaterally, and must avoid all exposure to hazards such as moving machinery and unprotected heights, and must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, excessive vibration, and irritants such as fumes, odors, dust, gases, and poorly ventilated areas. Non-exertionally the hypothetical individual should work in a low stress environment with no production line type of pace, or independent decisionmaking responsibilities. The hypothetical individual is limited to unskilled work involving only routine and repetitive instructions and tasks, should have no interaction with the general public, and no more than occasional interaction with co-workers and supervisors. Can an individual with those limitations perform the claimant's past work?

A:     No, Your Honor.

Q:     And are there any unskilled occupations in the national or regional economy

that such an individual could do?

A: Yes, Your Honor. At the light work classification a house sitter. Regionally, and the region includes West Virginia, Ohio, and Pennsylvania, 3,500, and nationally 74,000. An unarmed night watchman, regionally 5,000, and nationally 100,000. At the sedentary work classification surveillance system monitor, regionally 2,900, and nationally 87,000. A grader sorter regionally 2,000, and nationally 400,000, and a third example would be product inspector, regionally 30,000 and nationally 430,000.

Q: Okay. In the second hypothetical I would like you to consider the limitations set forth in two exhibits and they are C42F, pages 5 to 7, which are the non-exertional limitations, and C43F, page 1, which includes physical and postural limitations. Now if I give great weight to all of those limitations, would there be any jobs such an individual could perform?

A: No, Your Honor.

(R. at 59-61.)

Mr. Bowman, Plaintiff's attorney, then posed the following questions to Ms. Baldwin:

Q: Ms. Baldwin, with respect to Exhibit 43F, C43F, can you tell me what specific limitations you found would preclude substantial gainful activities.

A: The claimant would be unable to perform full-time work--

Q: Under the--

A: --based upon the limitations in standing, walking, and sitting.

Q: Okay. With--

ALJ: That would be less than eight hours total?

A: Correct.

ALJ: Okay.

Atty: With regard to the jobs that you've identified at the light level, under the original hypothetical question, if I were to tell you that a person, the same hypothetical person, would be off task 20 percent of the time due to pain, or medication problems, or whatever reason, would that affect your answers to the jobs provided and, if so, how?

A: Yes. It would be my opinion if an individual were so limited they could not perform the light or sedentary jobs I've identified.

Q: And a similar question but this limitation would be that the person would be absent from work more than two times per month on schedule, would that affect your answers to the question provided and, if so, how?

A: In my opinion, such an individual could not perform the light or sedentary jobs I've identified.

Q: Okay. And as far as the claimant's past relevant work, and I heard two of them.

A: Okay.

Q: I heard two of them that had an SVP: 2, which would make them unskilled, correct?

A: That is correct.

Q: Okay.

A: The cashier and stock clerk, as defined by the *DOT*, the stock clerk makes that with SVP: 4.

Q: So that's semi-skilled? Would there be any–

A: That is correct.

Q: Would there be any skills that would transfer to sedentary occupations?

A: No.

(R. at 61-62.)

Ms. Baldwin testified that her testimony was consistent with the *DOT*, with the exception of the sit/stand option. (R. at 62.) She also noted that she relied on her twenty-five years of experience as a rehabilitation specialist, information from the United States Department of Labor, statistics from the Bureau of Labor, occupational employment estimates, and OCU data from the U.S. Publishing Company. (R. at 63.)

A Report of Contact form dated March 16, 2009 noted that Plaintiff could no longer perform her past work as a cashier, sandwich maker, and maid. (R. at 234.) However, the form noted that she could perform work as a parlor chaperone, a kosher inspector, and a surveillance system monitor. (*Id.*)

## F.    *Lifestyle Evidence*

In an Adult Function Report dated February 9, 2009, Plaintiff reported that she lives alone in an apartment. (R. at 226.) She stated that her conditions affect her ability to dress herself and that her hair has fallen out because she could not take care of it. (R. at 227.) Plaintiff prepares frozen foods and canned foods in a microwave and also prepares simple sandwiches. (R. at 228.) She reported that she does not cook because of her pain. (*Id.*)

Plaintiff noted that she has her friends clean for her, but that she can wash her clothes every two weeks as long as she has someone to carry her clothes down to the basement. (R. at 228.) She also can wipe off her tables. (R. at 229.) Plaintiff can go out alone and can drive a car. (*Id.*) She shops once a month for food and personal hygiene products. (*Id.*) Plaintiff can pay bills, count change, handle a savings account, and use a checkbook and money orders. (*Id.*)

Plaintiff reported that she watches television "once in a blue moon." (R. at 230.) She talks to her sister on the phone once in a while but does not go places on a regular basis. (*Id.*) Plaintiff needs to be reminded to go to her appointments. (*Id.*) She can walk a block or two before needing to stop and rest. (R. at 231.)

In an Adult Function Report dated June 5, 2009, Plaintiff noted that she spends her days lying around the house and watching television. (R. at 245.) She takes care of a kitten by feeding it and providing it with water, but her cousin has to help her with the litter box. (R. at 246.) Plaintiff

reported that her conditions affect her ability to dress, bathe, care for her hair, and shave. (*Id.*) She stated that she can dust and wash out the sink, but that she needs encouragement to do these things because she does not want to do anything. (R. at 247.) Plaintiff reported that she goes outside daily. (R. at 248.)

In this report, Plaintiff stated that she does not spend time with others, but that she goes to appointments, physical therapy, and the dollar store on a regular basis. (R. at 249.) Her hobbies include watching television and sitting on her porch. (*Id.*) Plaintiff needs to rest for five to ten minutes before she can resume walking. (R. at 250.)

### III. CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, asks the Court to award her a period of disability. (Pl.'s Mot.) Specifically, Plaintiff asserts the following assignment of error:

• The ALJ committed reversible error when assessing her residual functional capacity ("RFC").

(Mem. of Law Supp. Pl.'s Mot. for Summ. J. ("Pl.'s Br.") at 5-10, ECF No. 11-1.)

Defendant, in his motion for summary judgment, asserts that the ALJ's decision "is supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot.) Defendant argues that the ALJ properly assessed Plaintiff's RFC in accordance with applicable law because:

• The ALJ appropriately considered the prior RFC assessment determined by a prior ALJ; and

• Substantial evidence supports the ALJ's determination that Plaintiff could perform a reduced range of light work.

(Def.'s Br. Supp. Mot. for Summ. J. ("Def.'s Br."), ECF No. 15 at 11-15.)

## IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.   ANALYSIS

**A.      Standard for Disability and the Five-Step Evaluation Process**

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . .  "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006).  The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2012). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.    *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1.   **The claimant has not engaged in substantial gainful activity since November 17, 2008, the application date or since the amended alleged onset date of September 27, 2008 (20 CFR 416.971 *et seq.*).**

2.   **The claimant has the following severe impairments: left upper extremity impairment to include history of recurrent rotator cuff tear, subacromial impingement, frozen shoulder syndrome, and adhesive capsulitis; degenerative joint disease of the cervical spine; history of cervical and thoracic spine strain/sprain; chronic bronchitis; diabetes mellitus with peripheral neuropathy of the bilateral lower extremities; Major Depressive Disorder; Anxiety Disorder; Personality Disorder; and history of substance abuse (20 CFR 416.920(c)).**

3.   **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

4.   **After careful consideration of the entire record, the undersigned finds that the claimant has had, at all relevant times, the following residual functional capacity: limited to light exertion which involves lifting/carrying of no more than 20 pounds maximum occasionally and 10 pounds maximum frequently; requires a sit/stand option at one-hour intervals; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, or crawl; can never reach (including overhead) or perform side lifting with the non-dominant left upper extremity; can frequently reach (including overhead) and perform side lifting with the right dominant upper extremity; can frequently handle, finger, and feel bilaterally; must avoid all exposure to hazards such as moving machinery and unprotected heights; must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, excessive vibration, and irritants such as fumes, odors, dusts, gases, and poorly ventilated areas; should work only in a low-stress environment with no production line type of pace or**

independent decision-making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; should have no interaction with the general public and no more than occasional interaction with co-workers or supervisors.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on January 29, 1958 and was 50 years old on the date the application was filed which is defined as an individual 'closely approaching advanced age' (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since November 17, 2008, the date the application was filed (20 CFR 416.920(g)).

(R. at 14-28.)

## C.    *Analysis of the Administrative Law Judge's Decision*

### 1.    The ALJ Improperly Assessed Plaintiff's RFC According to Applicable Law

#### a.    The ALJ Improperly Followed the Treating Physician Rule in Determining Plaintiff's RFC

As her sole contention, Plaintiff asserts that the ALJ's assessment of her RFC is contrary to established case law and lacks substantial evidence.  (Pl.'s Br. at 5-10.)  In support of her assertion, Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Marilyn Horacek and Damon

Brooks, two of Plaintiff's treatment providers. (Pl.'s Br. at 7-10.) Specifically, Plaintiff states that the ALJ erred in rejecting the opinions of RFC provided by Dr. Horacek and Mr. Brooks. (*Id.*) Furthermore, Plaintiff concedes that the ALJ's rejection of Mr. Brooks' opinion is not determinative because his limitations pertained to Plaintiff's mental conditions, not her physical impairments. (*Id.* at 10.) The undersigned finds that Plaintiff's argument with regards to Dr. Horacek's opinion has merit.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)) ("The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'"); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled, the determination or decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record,

and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the opinion with the record, 5) the degree of specialization of the physician, and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. **This explanation may be brief.**

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (emphasis added). However, the ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. *See Pinson v. McMahon*, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

As an initial matter, although Plaintiff argues that the ALJ improperly rejected Mr. Brooks' opinion regarding her mental functioning, the undersigned notes that the ALJ properly followed the treating physician rule in assigning little weight to this opinion. Plaintiff is correct that the ALJ

stated that Mr. Brooks' "conclusions are simply not supported by or consistent with the weight of the evidence as a whole as to be discussed in greater detail in the body of this decision." (R. at 23.) However, the ALJ later stated again that Mr. Brooks' opinion could not be afforded significant weight and then proceeded to discuss other substantial medical evidence in the record that contradicted Mr. Brooks' opinion. (R. at 25.)

Specifically, the ALJ referred to March 11, 2009 consultative examination report prepared by Holly Coville of Mansuetto Coville Psychological Services. (R. at 25; *see also* R. at 575-79.) Specifically, Ms. Coville noted that Plaintiff was cooperative, oriented, and coherent. (R. at 25; *see also* R. at 578.) She also found that Plaintiff's recent memory and insight were no more than mildly impaired and that her judgment was no more than moderately impaired. (R. at 25; *see also* R. at 578.) Furthermore, the ALJ specifically referred to treatment notes prepared during Plaintiff's course of treatment at Northwood Health Systems. (R. at 25.) These notes revealed that Plaintiff responded well to medication adjustments and had been observing improvement in her irritability and agitation. (*Id.*) She also admitted to being less verbally aggressive and better able to handle conflict. (*Id.*) Therefore, despite Plaintiff's concession that the rejection of Mr. Brooks' opinion is not determinative, the undersigned finds that substantial evidence supports the ALJ's assignment of little weight to this treating physician's opinion.

With regards to Dr. Horacek's opinion, the undersigned believes that Plaintiff is correct in her assertion that the ALJ did not properly follow the treating physician rule. When attributing little weight to Dr. Horacek's opinion and ultimately finding that Plaintiff was not disabled as Dr. Horacek opined, the ALJ stated in whole:

> While the undersigned has fully considered the essentially disabling treating source opinions of Dr. Horacek at Exhibits C13E and C43F, little weight has been afforded

this opinion evidence. Not only is it inconsistent with the weight of the evidence as a whole, but most notably, the objective findings of record do not support that the claimant would be incapable of meeting the basic sitting, standing, and walking requirements of a full eight-hour workday or be restricted to sedentary exertion as this treating source indicates. Dr. Horacek's opinion, particularly her most recent April 2011 assessment, appears to be overly reliant upon the claimant's subjective reports of pain, stiffness, weakness, and aggravating factors as opposed to noted objective and/or diagnostic findings. Review of Dr. Horacek's treatment notes does not reflect documented findings or observations supportive of such an extreme degree of limitation and again, her opinions are inconsistent with other opinion evidence of record with regard to the claimant's physical functioning. Moreover, the ultimate conclusion of disability is one reserved to the Commissioner pursuant to Social Security Ruling 96-5p and thus, her conclusions that the claimant is "unable to work" are not entitled to weight.

(R. at 22.)

The undersigned can identify three reasons why the ALJ attributed little weight to Dr. Horacek's opinion, namely: (1) Dr. Horacek's opinion regarding Plaintiff's physical limitations is "inconsistent with the weight of the evidence as a whole;" (2) Dr. Horacek's opinion is overly reliant on Plaintiff's subjective reports; and (3) Dr. Horacek's opinion conflicts with her treatment notes. Therefore, the undersigned will consider each of these in turn.

## 1. "Inconsistent With the Weight of the Evidence As a Whole"

First, the ALJ found that Dr. Horacek's opinion regarding Plaintiff's physical limitations "inconsistent with the weight of the evidence as a whole." (R. at 22.) The undersigned finds that this reason is not adequate because it fails to comply with the specificity requirements of 20 C.F.R. § 416.1527 and Social Security Ruling 96-2p.

This Court has previously been persuaded by a comparison to the analysis of another ALJ recently upheld in *Cramer v. Astrue*, No. 9:10-1872-SB-BM, 2011 WL 4055406 (D.S.C. Sept. 12, 2011). *See Smith v. Astrue*, No. 2:11-CV-77, slip op. at 10-11 (N.D. W. Va. June 13, 2012) (Bailey, C.J.). In *Cramer*, Dr. Edward Giove, the plaintiff's primary care physician, opined that the claimant

had difficulties with standing, sitting, or walking for extended periods of time because of her degenerative disc disease in the lumbar and cervical spine. *Cramer*, 2011 WL 4055406, at *2, 6. However, the ALJ determined that Ms. Cramer could stand, walk, and sit for six hours during an eight-hour workday. *Id.* at 6. In his decision to give Dr. Giove's opinion little weight, the ALJ determined that this opinion was not consistent with the doctor's own treatment notes because:

> Dr. Giove's treatment notes from November 2006 reflect the claimant reported improvement of her back pain from prescribed medication. Although the claimant saw Dr. Giove for treatment of other conditions after November 2006, there are no documented reports of her back pain in the record until September 2007. In October 2007, the claimant underwent an MRI of the cervical spine, which revealed degenerative disc disease at C3-C4 through C7-T1. However, in November 2007, Dr. Giove noted the claimant denied back pain at that time.

*Id.* at 9. The *Cramer* court determined that with this analysis, the ALJ "sufficiently described his reasons for giving Dr. Giove's opinion limited weight." *Id.* at 10.

In *Smith*, Chief Judge Bailey determined that "only an analysis like the one in *Cramer* is sufficiently specific to comply with 20 C.F.R. § 404.1527 and Social Security Ruling 96-2p." *Smith*, slip op. at 11. Here, the reasoning of the ALJ in Plaintiff's case for attributing little weight to Dr. Horacek's opinion falls short when compared to the analysis contained in *Cramer*. Instead of outlining specific items of medical evidence that were inconsistent with Dr. Horacek's opinions, the ALJ leaves the task of identifying those pieces of evidence to the Court. However, a court cannot affirm an ALJ's decision based upon *post hoc* reasoning. *See Secs. & Exch. Comm'r v. Chenery*, 332 U.S. 194, 196 (1947) ("[A] reviewing court . . . must judge the propriety of [agency] action solely on the grounds invoked by the agency."). Therefore, this reason fails to support the ALJ's decision to assign little weight to Dr. Horacek's opinions concerning Plaintiff's physical limitations, particularly her opinions concerning Plaintiff's limitations in sitting, standing, and walking.

### 2. Overly Reliant on Plaintiff's Subjective Reports

Second, the ALJ noted that "Dr. Horacek's opinion, particularly her most recent April 2011 assessment, appears to be overly reliant upon the claimant's subjective reports of pain, stiffness, weakness, and aggravating factors as opposed to noted objective and/or diagnostic findings." (R. at 22.) Yet a doctor who gives an opinion on a Social Security claimant's physical limitations must necessarily consider the claimant's subjective statements with other evidence because "obviously [the doctor] didn't conduct an eight-hour examination of [the claimant]." *Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012); *see also Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997) ("A patient's report of complaints, or history, is an essential diagnostic tool."); *Embrey v. Bowen*, 849 F.2d 418, 422 (8th Cir. 1988) ("The subjective judgments of treating physicians are important, and properly play a part in their medical evaluations."); *Brand v. Sec'y, Dept. of Health, Educ., and Welfare*, 623 F.2d 523, 526 (8th Cir. 1980) ("Any medical diagnosis must necessarily rely upon the patient's history and subjective complaints."). Therefore, this reason is insufficient to support the ALJ's decision to assign little weight to Dr. Horacek's opinions.

### 3. Inconsistent With Dr. Horacek's Treatment Notes

Third, the ALJ noted that a "[r]eview of Dr. Horacek's treatment notes does not reflect documented findings or observations supportive of such an extreme degree of limitation." (R. at 22.) Again, unlike the analysis in *Cramer*, the ALJ did not outline the specific treatment notes that were inconsistent with Dr. Horacek's opinion regarding Plaintiff's RFC. *See Cramer*, 2011 WL 4055406, at *9. Instead, the ALJ has left the task to the Court to determine which treatment notes conflict with her opinion. Therefore, this reason fails to support the ALJ's decision to assign little weight to Dr. Horacek's opinions.

In sum, the undersigned finds that the ALJ properly followed the treating physician rule in assigning little weight to Mr. Brooks' opinion. However, the ALJ improperly followed the treating physician rule in assigning little weight to Dr. Horacek's opinions because the reasons given by the ALJ are not sufficiently specific under 20 C.F.R. § 416.1527 and Social Security Ruling 96-2p. Therefore, the undersigned recommends that Plaintiff's motion be granted as to this issue and that the case be remanded to allow the ALJ to sufficiently state specific reasons for his decision to attribute little weight to Dr. Horacek's opinions, especially relating to her opinions regarding Plaintiff's sitting, walking, and standing limitations.

**b.** **The ALJ Properly Considered the Prior ALJ's Assessment of Plaintiff's RFC**

In support of her assertion that the ALJ improperly assessed her RFC, Plaintiff argues that the ALJ did not give proper consideration to *Lively v. Sec. of Health & Human Servs.*, 820 F.2d 1391 (4th Cir. 1987) by providing a less restrictive RFC than the RFC provided by the ALJ who denied Plaintiff's fifth claim for benefits. (*Id.* at 6-7.) Although the undersigned has recommended remand for the reasons discussed above, he finds that Plaintiff's argument regarding her prior RFC lacks merit.

In *Lively*, the Fourth Circuit noted that *res judicata* applies to Social Security disability cases and that this concept applies "to prevent the Secretary from reaching an inconsistent result in a second proceeding based on evidence that has already been weight in a claimant's favor in an earlier proceeding." *Lively*, 820 F.2d at 1392. However, while an ALJ must consider prior RFC findings, he or she is not bound to adopt those RFC findings verbatim. *Albright v. Comm'r*, 174 F.3d 473, 476-77 (4th Cir. 1999). Thus, "where a final decision . . . after a hearing on a prior disability claim contains a finding required . . . in the sequential evaluation process . . . , SSA must consider such

finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a . . . claim involving an unadjudicated period." AR 00-1(4), 2000 WL 43774, at *4. An adjudicator must consider the following factors:

> (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim."

*Id.* An ALJ "should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim." *Id.*

Here, Plaintiff asserts that the ALJ did not provide a different RFC as compared to the one provided by the prior ALJ because the ALJ did not afford Plaintiff additional restrictions. (Pl.'s Br. at 6.) Instead, Plaintiff argues, the ALJ actually increased Plaintiff's RFC from the prior RFC. (*Id.* at 7.) It is true that the ALJ for Plaintiff's current claim limited Plaintiff to less than concentrated exposure to temperature extremes and wet and humid conditions while the prior ALJ limited Plaintiff to all exposure to these conditions. (*Compare* R. at 20-21, *with* R. at 74.) However, while the prior ALJ did not include any limitations regarding vibration and irritants in his assessment of Plaintiff's RFC, the ALJ for Plaintiff's current claim limited her to less than concentrated exposure to excessive vibration and irritants such as dusts, gases, and odors. (*Compare* R. at 74, *with* R. at 20-21.) Therefore, factually, the ALJ's assessment of Plaintiff's RFC was not less restrictive than the one assessed by the prior ALJ. While the current ALJ allowed Plaintiff more exposure to temperature extremes and wet and humid conditions, he allowed her less exposure to vibration and irritants than the RFC assessed by the prior ALJ.

Furthermore, Plaintiff's argument fails as a matter of law. As noted above, an ALJ must consider prior RFC findings but is not required to adopt them verbatim. *Albright*, 174 F.3d at 476-77. Here, the ALJ specifically noted that he considered the prior ALJ's assessment of Plaintiff's RFC. (R. at 22.) Next, the ALJ stated that there was "sufficient evidence to support that [the prior ALJ's RFC] limitations remain reasonable and should be incorporated into the current residual functional capacity." (*Id.* (alteration in original).) Finally, the ALJ noted that he "afford[ed] great weight" to the prior ALJ's findings. (*Id.* (alteration in original).) Indeed, the ALJ gave greater weight to the prior ALJ's RFC assessment because the time period being adjudicated in Plaintiff's current claim began one day after that adjudicated by the prior ALJ. AR 00-1(4), 2000 WL 43774, at *4; *see also* R. at 12. Therefore, contrary to Plaintiff's assertion, the undersigned finds that the ALJ did comply with *Lively*, as interpreted by *Albright* and AR 00-1(4), when assessing Plaintiff's RFC.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for supplemental security income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **GRANTED** in part and be **DENIED** in part**.** Consequently, I **RECOMMEND** that Defendant's Motion for Summary Judgment (ECF No. 14) be **DENIED** in part and **GRANTED** in part, and the decision of the Administrative Law Judge be **REMANDED WITH INSTRUCTIONS** to allow the ALJ to sufficiently state specific reasons for his decision to attribute little weight to Dr. Horacek's opinions, especially relating to her opinions regarding Plaintiff's sitting, walking, and standing limitations.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **13th** day of **August, 2012**.


_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE